647 A.2d 174

JOYCE ROTONDO, PETITIONER–RESPONDENT, v. CARLSTADT–
EAST RUTHERFORD REGIONAL HIGH SCHOOL DISTRICT,
BERGEN COUNTY, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 17, 1993—Decided August 10, 1994.

Before Judges GAULKIN, R.S. COHEN and D'ANNUNZIO.

*John L. Molinelli* argued the cause for appellant (*Maycher & Molinelli,* attorneys).

*Beverly M. Wurth* argued the cause for respondent.

*Melissa Vance Kirsch,* argued the cause for *amicus curiae* New Jersey Association of School Administrators.

*Fred De Vesa,* Acting Attorney General, attorney for respondent State Board of Education filed a statement in lieu of a brief (*David Earle Powers,* Deputy Attorney General, on the statement).

The opinion of the court was delivered by

R.S. COHEN, J.A.D.

This is an appeal from a decision of the State Board of Education holding that a local school board does not have the authority to employ a teacher who is not recommended by the chief school administrator. We reverse.

Mary Schneider was a non-tenured music teacher employed by the Carlstadt–East Rutherford Regional Board of Education ("local board"). When it came time for renewal of her contract—a renewal which would give her tenure—the chief school administra-

tor [1] (CSA) recommended to the local board that Schneider should not be reemployed. The local board therefore did not offer her a new contract. After a public protest by the families of students and a resulting reconsideration, the local board reversed its decision and offered Schneider a new contract over the objection of the CSA. Joyce Rotondo, a member of the local board who did not attend the meeting at which the new decision was made, filed a petition with the Commissioner of Education seeking to set aside the decision as improper because it was contrary to the recommendation of the CSA.

The contested matter was heard by an administrative law judge, who concluded that the local board's decision was reasonable in the light of Schneider's positive evaluations and "the loyalty which she apparently engendered in the parents of her students." She also ruled that the local board was not bound to follow the CSA's recommendation, but rather was obligated only to consider it.

The Commissioner reversed the ALJ's initial decision. He relied on what he described as state policy, reflected in State Board regulations, "that, while boards of education are specifically authorized to ultimately select the persons who are employed in the district, the flow of candidates from which they choose is controlled by the CSA." The Commissioner did not address the meaning or effect of any statutory provisions on the subject.

The State Board of Education affirmed for the reasons the Commissioner expressed and without further comment.

▇ We first examine the statutory background. In New Jersey, it is the Legislature that has the constitutional responsibility of providing a thorough and efficient system of public education. *N.J. Const.* (1844) art. IV, § 7, ¶ 6 (as amended in 1875); *N.J. Const.* (1947) art. VIII, § IV, ¶ 1; *Robinson v. Cahill (I),* 62 *N.J.* 473, 509, 303 *A.*2d 273 (1973); *Board of Educ. of Elizabeth v. City*

---

[1] A chief school administrator is, for the purpose of this case, the same as a superintendent of schools. *See N.J.A.C.* 6:3–1.3.

*Council of Elizabeth,* 55 *N.J.* 501, 505–06, 262 *A.*2d 881 (1970); *Board of Educ. of East Brunswick Tp. v. Township Council of East Brunswick Tp.,* 48 *N.J.* 94, 103, 223 *A.*2d 481 (1966). The Legislature chose to fulfill its responsibility by creating a State Board of Education, the office of the Commissioner, and local school districts, and delegating to them portions of its constitutional responsibilities. *East Brunswick, supra,* 48 *N.J.* at 103–04, 223 *A.*2d 481. It is therefore necessary to consider the policies implicit in the framework the legislature established. Both State and local boards have the authority to adopt rules and regulations, but local board rules must be "not inconsistent with [the statute] or with the rules of the state board." *N.J.S.A.* 18A:11–1c.

*N.J.S.A.* 18A:27–1 provides:

No teaching staff member shall be appointed, except by a recorded roll call majority vote of the full membership of the board of education appointing him.

This provision has existed for over ninety years. *See* L.1903 (2d Sp.Sess.), c. 1, § 68, p. 25. There is nothing in it, or in any other statutory provision, that affords the CSA a veto or other controlling role in the process of appointing teaching staff members. There is another part of the 1903 legislation which is also in the current law which gives the CSA exactly that controlling role in the appointment of assistant superintendents. L.1903 (2d Sp. Sess.), c. 1, § 65, p. 24. It provides that a board of education "may, upon nomination of the superintendent, by a recorded roll call majority vote ... appoint assistant superintendents of schools." *N.J.S.A.* 18A:17–16.

The difference between the sections is easily noted. Only the superintendent can propose an assistant superintendent. The board need not appoint the nominee, but it may not appoint someone the superintendent has not proposed. With respect to the appointment of teaching staff members, there is nothing to limit local boards to the candidates proposed by the superintendent.

A newer set of statutory provisions also affords a pertinent contrast. In 1975, legislation was enacted to govern school dis-

tricts in cities of the first class with population over 325,000. L.1975, c. 169; *N.J.S.A.* 18A:17A–1 *et seq.* Only Newark meets the population test. The statute was the response of the Legislature, the Governor and the Commissioner of Education "to the increasingly intolerable chaos infecting the Newark public school system." *Gibson v. Board of Educ. of Newark,* 205 *N.J.Super.* 48, 50, 500 *A.2d* 27 (App.Div.1985).

The statute created the new position of "executive superintendent," who was clearly intended to have substantially greater power than superintendents in other districts. Beyond the right of superintendents generally to a non-voting seat on the local board of education, and the right to speak at board meetings on all educational, managerial, and fiscal matters, *N.J.S.A.* 18A:17–20; 18A:17A–3, the executive superintendent is granted complete authority over district fiscal affairs and business management. *N.J.S.A.* 18A:17A–4.

The statute gives the executive superintendent extraordinary personnel powers, designed, no doubt, to prevent the district board from appointing personnel who might undermine the work of the executive superintendent. The law gives him the authority to appoint and remove "clerks in his immediate office". *N.J.S.A.* 18A:17A–5a, and the authority, "subject to the approval of the board," to appoint and fix the compensation of assistant executive superintendents. *N.J.S.A.* 18A:17A–5b. Finally, as to all other district employees, the statute provides, in *N.J.S.A.* 18A:17A–5c:

The executive superintendent shall propose to the board of education all other officers and employees, professional and non-professional, for employment, transfer and removal.

The 1975 statute thus expressly affords the "super" superintendent the authority to act as a gatekeeper on all hirings, that is, to limit candidates for appointment to persons he proposes. *N.J.S.A.* 18A:17A–5c clearly prohibits appointing to the teaching staff any person who was not proposed by the executive superintendent. The obvious negative implication is that the Legislature believed that *N.J.S.A.* 18A:17A–5c was necessary because *N.J.S.A.* 18A:27–1 does not give the generality of superintendents such control over

staff hiring, or impose on local boards such an important limitation on their authority to appoint staff. *See also N.J.S.A.* 18A:16–1.

Against this statutory background, we examine the history of rule adoption and agency adjudication. *N.J.A.C.* 6:3–1.12 prescribed the job duties of CSAs until it was repealed and replaced in 1990. 22 *N.J.R.* 1876 (June 18, 1990). *N.J.A.C.* 6:3–1.12(d), (e), and (f) concern the CSAs' role in hiring and firing; (d) and (e) are many decades old. *See* 15 *N.J.R.* 376 (March 21, 1983). They provide:

> (d). He or she shall appoint such clerks as may be authorized by the district board(s) of education.
>
> (e). He or she shall nominate to the district board(s) of education such assistant superintendents as shall be authorized by the district board(s) of education.

On their face, (d) and (e) differ in that they authorize the CSA to hire clerks, but authorize the CSA only to propose to the local board a candidate for assistant superintendent, whom the board can accept or reject. The rule provisions are therefore faithful to *N.J.S.A.* 18A:17–24 and 18A:17–16.

Subsection (f) was added in 1988. 20 *N.J.R.* 1879 (August 1, 1988). It says:

> (f). He or she shall recommend to the district board(s) of education formal appointment of all teaching staff members.

It is notable that (f) does not use (e)'s already familiar concept of nomination, which was treated by the Commissioner in *Ross v. Jersey City Bd. of Educ.,* 5 *N.J.A.R.* 393 (1981) (under *N.J.S.A.* 18A:17–16, board may not appoint assistant superintendent not nominated by the CSA, but need not appoint CSA's nominee.). Instead, (f) substitutes the concept of recommendation. That substitution was made against the background of *De Ferrari v. Board of Educ. of Secaucus,* 1979 *S.L.D.* 494, and *Cardman v. Board of Educ. of Millburn,* 1977 *S.L.D.* 746. In *De Ferrari,* the Commissioner of Education decided that the district board did not have to accept the CSA's recommendation for appointment of a principal; that it could appoint its own choice after doing its own interviews and evaluations and without the CSA's recommendation; that restricting the board to candidates recommended by the

CSA "is unduly restrictive and, if adopted, would constitute an illegal divestiture of the Board's statutorily conferred authority. The Commissioner so holds." *De Ferrari, supra,* 1979 *S.L.D.* at 497. The Commissioner went on to say that "a desirable practice" would be for a board which rejects a CSA recommendation not to go off on its own, but rather to ask the CSA for an alternate recommendation. *Id.* In *Cardman,* the Commissioner of Education stated that a local board could not delegate to the CSA its statutory responsibility to appoint teaching staff members. *Cardman, supra,* 1977 *S.L.D.* at 750.

The 1988 rulemakers must have been aware that they chose different words for the second of these two back-to-back subsections. The use of different language in (f) must have had a purpose. The purpose might have been to avoid the 1981 *Ross* result (CSA nomination required for assistant superintendents) in the case of teaching staff members, and to adopt the Commissioner's 1979 *De Ferrari* position that a local board could reject the CSA's recommendation and appoint its own candidate for a teaching position, but a "desirable practice" was to get from the CSA an alternate recommendation. The rulemakers may also have had in mind the Commissioner's 1977 statement in *Cardman* that it was unlawful to delegate the staff appointment function.

The State Board's 1988 comment on the proposed subsection (f) suggested it was abandoning *De Ferrari:*

> *N.J.A.C.* 6:3–1.12(f) is a new section requiring a recommendation of the chief school administrator for formal appointment of all teaching staff members. This amendment coincides with the requirement established in *N.J.A.C.* 6:8–4.3(a)6vii.
> [20 *N.J.R.* 1028 (May 16, 1988)]

The referenced rule, now codified as *N.J.A.C.* 6:8–4.8(a)5i, is one of the monitoring regulations. They establish criteria for acceptable performance by school districts. In the monitoring area known as "teaching staff and professional development," an acceptable rating is achieved if the CSA recommends appointments of teaching staff, as *N.J.A.C.* 6:3–1.12(f) prescribed.

*N.J.A.C.* 6:3–1.12 was repealed in 1990 and replaced by *N.J.A.C.* 6:11–9.3(a), which provides that CSAs, as part of their job, "are

authorized to recommend all staff appointments and other personnel actions ... for approval by the district board of education." The new rule does not mention hiring of clerks and assistant superintendents. Apparently, the rulemakers were satisfied to rely on the statutory provisions on the subject.

*N.J.A.C.* 6:8–4.8(a)5i and 6:11–9.3(a) seem to contemplate that a district board appointment of a teaching staff member will be preceded by the affirmative recommendation of the CSA. One could argue that a "recommendation" could be affirmative or negative, and the board need only consider the CSA's views. The context in which the term is used belies such a reading. In addition, the common use of the word connotes affirmative sponsorship and approval. See *Webster's Third New Int'l Dictionary*, 1897 (1966). Moreover, the Commissioner has consistently read the word in that way in the last few years. *See Brescia v. Pemberton Tp. Bd. of Educ.,* 1991 *S.L.D.* 506 (appointment and transfer of principal only on the recommendation of the CSA); *Stevens v. Board of Educ. of Spotswood,* C. # 171–92 (Commissioner, July 22, 1992).

The Commissioner's reading of the rules is ordinarily entitled to some considerable respect. However, when the Commissioner's view produces a result described by a predecessor as "an illegal divestiture of the Board's statutorily conferred authority," *De Ferrari, supra,* 1979 *S.L.D.* at 497, the situation is complicated. And, when the Commissioner's view is one that finds only ambiguous expression in the regulations themselves, the situation is even more unclear.

There are two regulations involved. One is *N.J.A.C.* 6:8–9.3(a). It is not a regulation that deals with the authority of local boards, but is rather a description of the authorized activities of persons holding certificates endorsed as "school administrator," which the regulation defines to include superintendents, assistant superintendents, executive superintendents and directors. Holders of this endorsement are authorized to do a whole paragraph full of things, including "to recommend all staff appointments and other

personnel actions ... for approval by the district board of education." There is simply nothing in this regulation to deal with the force or effect of such a recommendation. Even the Commissioner does not argue that assistant superintendents can veto teacher appointments.

The other regulation is *N.J.A.C.* 6:8–4.8(a)5i. It is part of the "thorough and efficient" monitoring regulations that comprise *N.J.A.C.* 6:8–1.1 *et seq.* Those regulations establish a lengthy list of performance goals for school districts, but do not fix the legal rights of persons and districts. The apparent consequence of a district's failing to meet standards is discovery by the monitoring process, which takes place once every seven years, and strong encouragement to the district to conform, and the ultimate threat of revocation of district certification. The monitoring regulations are not designed to create new legal relationships and define the legal authority of various school agents and agencies. Instead, the regulations are designed to evaluate performance according to parameters established elsewhere. The State Board is arguably rewriting a regulation while purporting to interpret it. *Compare Venuti v. Cape May County Constr. Bd. of App.*, 231 *N.J.Super.* 546, 554, 555 *A.2d* 1175 (App.Div.1989).

We will leave to the side our misgivings about the ambiguity of the regulations, and, for the purpose of this case, take the State Board's word that they are intended to prohibit local board appointment of teaching staff without CSA affirmative recommendation. If that is what they do, they are invalid.

The fundamental issue is whether regulations barring a local board from appointing a teaching staff member without the affirmative recommendation of the CSA are invalid because they contravene *N.J.S.A.* 18A:27–1. We think they are. The statutory section does not hint that the local board's authority to appoint is

restricted to persons sponsored [2] by the CSA. The Commissioner ruled squarely in *De Ferrari* and inferentially in *Cardman* that such a restriction would violate the statutory rights of local boards. The absence of such a restriction is in vivid contrast with *N.J.S.A.* 18A:17–16, which restricts a board's authority to appoint an assistant superintendent to a person receiving the "nomination of the superintendent," and is also in vivid contrast with *N.J.S.A.* 18A:17A–5c, which was written to substantially strengthen the control of the executive superintendents in a troubled, badly administered school district. Such "super" superintendents "propose to the board of education all other officers and employees, professional and nonprofessional, for employment, transfer and removal," *N.J.S.A.* 18A:17A–5c, subject to the ultimate authority of the district board to appoint, transfer and remove. *N.J.S.A.* 18A:17A–7. There is no statutory warrant for an administrative rule that elevates the authority of superintendents generally to the level of the authority granted executive superintendents in the special circumstances presented by the Newark schools.

The statutory differences are understandable. Assistant superintendents in all districts have to work closely and supportively with their superintendents. It would not do for the district board to force on its superintendent an unwelcome and uncooperative assistant. The CSA does not have that kind of relationship with teaching staff members, and therefore does not need a veto over their appointment. Also, in a troubled big-city district, where the "super" powers of an executive superintendent are needed for reform and renewal of the district, it is important to centralize and control the appointment of all district staff members. Thus, the executive superintendent is given ultimate control. We cannot find in the letter or spirit of the statutes the power of CSAs to veto teacher appointments in ordinary school districts.

---

[2] We can see no operative difference between "propose," "nominate," or "recommend" in this context. Whatever word is chosen, the result is that the CSA can veto a person he or she finds unacceptable.

In our decision, we do not evaluate educational policy, but interpret the meaning of statutory provisions. We do not prefer one policy over another, but say only that the Legislature, the ultimate repository of public policy, has spoken on the matter. If a new answer is to be reached, it is the Legislature that has to reach it. It seems plain to us that in those specific circumstances in which the Legislature wanted the CSA to control the appointment of professional personnel by granting or withholding approval, it clearly said so. The absence of a similar provision in *N.J.S.A.* 18A:27–1 seems dispositive to us.

Reversed.