MOYNIHAN, J.S.C. (temporarily assigned).
*1193 *249 The New Jersey Council of Educational Services Commission (Council) appeals the March 2, 2016 resolution of the New Jersey State Board of Education (State Board) approving Middlesex Regional Educational Services Commission's request to change its name to the Educational Services Commission of New Jersey (ESC-New Jersey).[2] We affirm, concluding the State Board had authority to approve the name change and that its action was not arbitrary and capricious.
I.
ESC-New Jersey challenges Council's standing to appeal the State Board's decision, contending: (1) Council provides no services that are adversely impacted-directly or indirectly-by the name change; (2) Council's stance ignores the competitive environment in which ESCs operate in order to provide low-cost services to students and public educational entities; and (3) no Council member proved damages as a result of alleged unfair competition engendered by the name change.
Whether Council has standing to challenge the Board's actions is fundamentally a question of law. See People for Open Gov't v. Roberts, 397 N.J. Super. 502, 508, 938 A.2d 158 (App. Div. 2008). Consequently, we conduct a de novo review.
New Jersey courts liberally accord standing.
*250 N.J. Citizen Action v. Riviera Motel Corp., 296 N.J. Super. 402, 415, 686 A.2d 1265 (App. Div. 1997). In the context of representative standing, our courts have concluded
an association has standing to sue as the sole[-]party plaintiff when it has a real stake in the outcome of the litigation, there is a real adverseness in the proceeding, and the complaint "is confined strictly to matters of common interest and does not include any individual grievance which might perhaps be dealt with more appropriately in a proceeding between the individual [member] and the [defendant]."
[ Id. at 416, 686 A.2d 1265 (second and third alterations in original) (quoting Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 109, 275 A.2d 433 (1971) ). See generally Pressler & Verniero, Current N.J. Court Rules, cmt. 2.2 on R. 4:26-1 (2018).]
Council is a non-profit corporation whose active members include "either the president or vice president or a designated member of the board of directors of each [ESC] represented by [Council]" and the superintendent of each ESC. Council represents the interests of nine ESCs[3] which *1194 oppose ESC-New Jersey's name-change application; it does not seek monetary damages for any loss suffered by an active member, but seeks to void the State Board's approval of ESC-New Jersey's name change. Standing, therefore, is conferred on Council under the Crescent Park standard, especially considering that common representation will "avoid[ ] the procedural burdens accompanying multiple party litigation." 58 N.J. at 109, 275 A.2d 433.
We reject ESC-New Jersey's contention that Council lacks standing because they have not shown damages resulting from the Board's action. As we previously held:
[E]ven in the absence of injury to itself, "an association may have standing solely as the representative of its members." In such a situation, the association must allege that its members, or any one of them, "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."
*251 [ In re Ass'n of Trial Lawyers of Am., 228 N.J. Super. 180, 186, 549 A.2d 446 (App. Div. 1988) (quoting Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ).]
Although a party with a financial interest that is directly affected by an administrative agency's action has standing to challenge the agency's decision, In re Camden Cty., 170 N.J. 439, 448, 790 A.2d 158 (2002), "[o]nly '[a] substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable [administrative] decision is needed for the purposes of standing,' " id. at 446, 790 A.2d 158 (second alteration in original) (quoting N.J. Chamber of Commerce v. N.J. Election Law Enf't Comm'n, 82 N.J. 57, 67, 411 A.2d 168 (1980) ).
This is a close case considering Council offered meager proof of actual economic damages that would result from the name change but, in consonance with our liberal standing threshold, we elect to review Council's allegations, particularly in light of Council's argument that the Board was without authority to approve ESC-New Jersey's name change.
We find insufficient merit in the balance of ESC-New Jersey's standing arguments to warrant discussion. R. 2:11-3(e)(1)(E).
II.
In support of its argument that the State Board acted arbitrarily, capriciously and unreasonably, Council advances a number of theories. It avers the State Board lacked statutory authority to effect an ESC's name change because neither the express provisions of the ESC legislation, N.J.S.A. 18A:6-51 to -70, nor the statutory scheme of those laws, allow State Board action to change an ESC's name-only to approve an ESC's original name.
We agree with Council that no statute expressly authorizes the State Board to approve an ESC's name change. We, therefore, look to the statutes that govern ESCs in order to accomplish our goal of determining and effectuating the Legislature's intent. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553-54, 964 A.2d 741 (2009). When the plain language of the statute does not guide *252 our determination, we seek "further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has *1195 chosen." Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 264, 952 A.2d 1077 (2008).
Whether the State Board had authority to approve the name change was not raised prior to the approval of ESC-New Jersey's application; hence, the State Board did not speak to this issue. Since the issue is purely legal we independently review the applicable law. State v. Buckley, 216 N.J. 249, 260-61, 78 A.3d 958 (2013) ; Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). "The construction of statutes is a judicial, not an executive function ...." Serv. Armament Co. v. Hyland, 70 N.J. 550, 561, 362 A.2d 13 (1976). A statute is, fittingly, our polestar in explicating a legislative enactment, as recognized by our Supreme Court:
In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the [L]egislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.
[ State v. Gandhi, 201 N.J. 161, 177, 989 A.2d 256 (2010) (quoting N.J.S.A. 1:1-1 ).]
Because our analysis perpends a number of provisions governing ESCs, we heed the Court's prescription that
[s]tatutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole. When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will. Statutes that deal with the same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole.
[ In re Petition for Referendum on City of Trenton Ordinance 09-02, 201 N.J. 349, 359, 990 A.2d 1109 (2010) (citations omitted).]
The Legislature defined an ESC as "an agency established or to be established in one or more counties for the purpose of carrying on programs of educational research and development and providing to public school districts such educational and administrative services as may be authorized pursuant to rules of the State Board of Education." N.J.S.A. 18A:6-51(a). Not only did the Legislature *253 vest authority in the State Board to promulgate those enabling rules, it gave the State Board a wide role in the establishment and governance of ESCs.
Any local board of education wishing to establish an ESC must petition the State Board for permission. N.J.S.A. 18A:6-52(a). The Legislature charged the State Board with the task of studying the petition, and an attached report, which must include
the kind or kinds of educational and administrative services and programs which are deemed to be needed and proposed to be provided, an estimate of the cost of providing such services and programs, a method of financing the expenditures of such commission, including a detailed budget which projects anticipated costs and identifies anticipated sources of revenue until such can be financed under its first regularly adopted budget, and any other data or information deemed pertinent.
[Ibid. ]
After a comprehensive review of the petition, the State Board must "determine whether there is a need for such a commission and whether its operation is feasible";
*1196 if it does, it shall approve the petition. Ibid.
Once approved, the Legislature mandates the formation of a representative assembly[4] by the ESC-member boards of education, N.J.S.A. 18A:6-53, and the election of a board of directors[5] by the representative assembly, N.J.S.A. 18A:6-54, -55. The statutory provisions relating to the authority and duties of representative assemblies and boards illustrate the extent to which the Legislature conferred oversight of ESC activities to the State Board:
*254 The board of directors may purchase, lease-purchase or lease personal or real property in accordance with rules and regulations to be adopted by the State [B]oard of [E]ducation.
[ N.J.S.A. 18A:6-61.]
The representative assembly shall from time to time determine what services and programs shall be provided by the commission, subject to approval of and pursuant to rules of the State Board of Education.
[ N.J.S.A. 18A:6-63(a).]
Commissions may enter into contracts with other public and private agencies for the provision of approved services and programs to participating public school districts and nonpublic schools. These contractual arrangements shall conform to rules and regulations of the State Board of Education ....
[ N.J.S.A. 18A:6-63(b).]
The board of directors may enter into a contract with and receive and administer funds and grants from any individual or agency, including but not limited to, agencies of the federal government of the United States, provided that the funds or grants are for programs or services for which the commission has received approval from the State [B]oard ....
[ N.J.S.A. 18A:6-67.]
The board of directors shall adopt and employ such a system of bookkeeping and accounting as may be prescribed by the State Board of Education.
[ N.J.S.A. 18A:6-68.]
The representative assembly may enlarge or alter the purposes for which the formation of the commission was approved, upon application to and approval by the State Board of Education.
[ N.J.S.A. 18A:6-69.]
Another provision relating to ESC boards provides
[t]he board of directors shall be a body corporate, and shall be known as "the board of directors of ...." (here shall be inserted a suitable name to be adopted by the board of directors with the approval of the State Board of Education, but such name shall contain at least the words "Educational Services Commission").
[ N.J.S.A. 18A:6-61.]
Council argues the Legislature provided, in this section, the only authority the State Board has in connection with the approval of an ESC's name. It points to N.J.S.A. 18A:6-69 by which the State Board was *1197 granted authority to enlarge or alter an ESC's original purpose, and contends that statute expressly allows the State Board to change an ESC's original purpose as approved by State Board pursuant to N.J.S.A. 18A:6-52. Absent like authority to amend an ESC's name, Council avers the State Board lacked authority to approve ESC-New Jersey's name change. *255 We do not agree with Council's restrictive view of the ESC legislation. The State Board-an administrative agency-"has the right to exercise only those powers that are expressly and duly delegated to it, or that are impliedly incident to those expressly granted powers." Young v. W. Elec. Co., 96 N.J. 220, 225, 475 A.2d 544 (1984) (citation omitted). More specifically, the State Board's authority
"consists of the powers expressly granted which in turn are attended by those incidental powers which are reasonably necessary or appropriate to effectuate the specific delegation." [Our Supreme] Court has held that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent. ... In determining whether a particular administrative act enjoys statutory authorization, the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives. The purpose of this inquiry is to ascertain whether the requisite authority may be said to be implicitly supplied, as "[t]hat which is implied is as much a part of the law as that which is expressed."
[N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978) (second alteration in original) (citations omitted) (first quoting In re Regulation F-22 of the Office of Milk Indus., 32 N.J. 258, 261, 160 A.2d 627 (1960) ; and then quoting In re Suspension of Heller, 73 N.J. 292, 302, 374 A.2d 1191 (1977) ).]
This is not a case where the State Board should be denied the power to amend an ESC's name because "there exists reasonable doubt as to whether" it was granted that authority. In re Closing of Jamesburg High Sch., 83 N.J. 540, 549, 416 A.2d 896 (1980). The Legislature's choice to refrain from specifically providing authority for the State Board to approve an ESC's name change after initial approval does not persuade us that it intended to deny the State Board that power. First, it is illogical to extend power to approve the establishment of an ESC, and its initial name, and to approve any change in an ESC's purpose, but not to vest authority in the Board to change the original name. Furthermore, the relatively minor action of a name change is one that can reasonably be viewed as so mundane, and so obviously within the purview of the State Board's authority, that the Legislature chose not to detail that authority in the statutes. See *256 Sheeran v. Progressive Life Ins. Co., 182 N.J. Super. 237, 247-48, 440 A.2d 469 (App. Div.) (recognizing that "[a]lthough 'the Legislature may not vest unbridled or arbitrary power in the administrative agency but must furnish a reasonably adequate standard to guide it, ... the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power' " (alteration in original) (quoting Heller, 73 N.J. at 303, 374 A.2d 1191 )).
We perceive the Legislature's grant of broad oversight powers to the State Board-as detailed above-including *1198 approval of an ESC's original name, and the authority to amend an ESC's purpose, impliedly confers the authority on the State Board to change an ESC's name. "A rule of strict construction cannot be permitted to defeat the evident legislative design. A statute may speak as plainly by inference, and by means of the purpose which underlies it, as in any other manner. That which is clearly implied is as much a part of the law as that which is expressed." Cammarata v. Essex Cty. Park Comm'n., 46 N.J. Super. 262, 270, 134 A.2d 604 (App. Div. 1957).
Moreover, the power to change an ESC's name is certainly included in the "general supervision and control of public education" in New Jersey accorded to the State Board by the Legislature. N.J.S.A. 18A:4-10. The Legislature also provided the State Board with "all powers, in addition to those specifically provided by law, requisite to the performance of its duties." N.J.S.A. 18A:4-16.
We deem any further arguments by Council advancing a more restrictive statutory interpretation, including the application of the inapposite holding in Rotondo v. Carlstadt-East Rutherford Regional High School Distrust, 276 N.J. Super. 36, 647 A.2d 174 (App. Div. 1994), to this case, to be without sufficient merit to warrant discussion here. R. 2:11-3(e)(1)(E).
We also reject Council's argument that the State Board's grant contravened "the Legislature's intent in implementing the statute and fulfilling its constitutional responsibility in ensuring each *257 student receives a thorough and efficient system of public education," by providing a competitive advantage to ESC-New Jersey over the other ESCs.
In enacting and modifying "[a]n Act concerning education, authorizing the establishment of [ESCs], prescribing their functions, powers and duties, and supplementing Title 18A of the New Jersey Statutes [ (the Act) ],"[6] S. Educ. Comm. Statement to S. 727 1 (May 6, 1968), the Legislature provided that an ESC could be "established in one or more counties" to implement educational research and development programs and provide authorized educational and administrative services to public school districts. N.J.S.A. 18A:6-51(a) (emphasis added). "[F]ive or more boards of education in any county or in any two or more counties... may petition" the State Board for permission to establish an ESC. N.J.S.A. 18A:6-52(a) (emphasis added). ESCs may "enter into contracts with school districts, whether member districts of the [ESC] or not, to provide any or all ... services and programs." N.J.S.A. 18A:6-63(a) (emphasis added). We discern from those provisions that the Legislature placed no geographical limits on boards that wish to band together to form an ESC, or on the operation of ESCs throughout the State.
The Act's express provisions manifest the legislative intent that ESCs may provide services to districts over a wide geographical range. The Legislature did not intend to limit ESCs to a single county or region-or to establish operational fiefdoms for local ESCs. The State Board's recognition of ESC-New Jersey's expansion of services did not offend the Act's legislative intent. In fact, any increase in competition among ESCs would logically benefit districts in search of services and programs.
Furthermore, Council's contention that the name change provided a competitive advantage to ESC-New Jersey is unsupported by any evidence in the record. Council makes only bare assertions that *1199 the State Board's approval of the name change created the *258 impression that ESC-New Jersey is "[s]tate-sanctioned and superior to the 'county' ESCs." As the Commissioner of Education recognized just prior to the Board's approval of the name change, the Board had granted ESC-New Jersey
the right to expand its mission statewide. And the resolution ... will allow [it] to change its name to reflect that statewide mission.
... One of their primary missions here at the Department [of Education] and with the [State] Board has been this commitment to developing structures and organizations in the State that can expand quality programs and services to students. But we're also committed to supporting shared services and joint purchasing that will result in more efficiency and savings to tax payers.
The boards of education seeking programs and services through an ESC are sophisticated consumers. It is a reasonable conclusion that, guided by their professional educational staffs, they will select ESC products based on the quality of the services and programs provided to their students and the taxpayer-borne costs of same-not by the name of the ESC-provider.
III.
Council contends the State Board's action was arbitrary and capricious because it did not consider
(1) that all other ESCs were in the same or similar position as [ESC-New Jersey] in terms of anticipated expansion and existing provision of services to several districts around the [S]tate, and therefore changing the name is unnecessary and would possibly cause greater confusion; and (2) arbitrarily selecting one ESC above all others to be identified as "The Educational Services Commission of New Jersey" would result in an unfair marketing advantage to [ESC-New Jersey] and suggest a hierarchy among the ESCs that does not and should not exist.
Our review of the factual underpinnings of an administrative agency's decision is limited to "not whether [we] would come to the same conclusion if the original determination was [ours] to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Charatan v. Bd. of Review, 200 N.J. Super. 74, 79, 490 A.2d 352 (App. Div. 1985). A court may "intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy." George Harms Constr. Co. v. N.J. Turnpike Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).
*259 It is well settled that the appropriate standard of review to be applied by an appellate court reviewing the final decision of an administrative agency is for the court to examine the record to determine whether sufficient or substantial credible evidence exists therein to support the agency decision. The agency determination is not to be vacated in the absence of a showing that the decision is arbitrary or capricious, that it lacks support in the record or that it violates legislative policies expressed or fairly to be implied in the statutory scheme administered by the agency. Furthermore, should there be substantial evidence in the record to support more than one result, it is the agency's choice which governs.
[ Dore v. Bd. of Educ., 185 N.J. Super. 447, 453, 449 A.2d 547 (App. Div. 1982) (citations omitted); see also Dennery v. Bd. of Educ., 131 N.J. 626, 641, 622 A.2d 858 (1993).]
Viewed through that lens, we conclude Council's arguments are without sufficient *1200 merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E). We add only limited comments.
As stated, Council presented the State Board with nothing more than the bald-faced conclusions that the name change would cause confusion among the local boards, and would result in an unfair marketing advantage.
We also agree with ESC-New Jersey and the State Board that the State Board considered the evidence presented at the public hearings conducted prior to its action, and that the name change was properly supported by substantial evidence. Although other ESCs provide services and programs throughout the State, most of those services are in transportation. ESC-New Jersey, in addition to transportation services-which account for less than thirty-six percent of ESC-New Jersey's budget-provided a score of educational programs to seventy-five districts in eleven counties; ESC-New Jersey also had, by far, the largest total revenues based on 2015 reports.[7] Further, the State Board considered *260 ESC-New Jersey's answers to a questionnaire it sent ESC-New Jersey that addressed some of the concerns raised by Council.
The June 3, 2015 resolution adopted by the State Board when it approved ESC-New Jersey's enlargement of purpose recognized that, in addition "to provid[ing] educational and administrative services and programs to member school district boards of education," it was "approved to provide services to nonpublic schools, cooperative transportation to out-of-district schools, cooperative purchasing, adult education, summer school, computer services, specialized consultants, printing and duplicating services, equipment maintenance services and other specialized services." Its scope of purpose was enlarged in or about December 1991 to allow provision of nursing services to nonpublic schools. A prior name-change application from Middlesex County Educational Services Commission to Middlesex Regional Educational Services Commission was approved in or about June 2005. The scope resolution also recognized that ESC-New Jersey was then providing services to twenty-four districts in Middlesex County, and to over eight-hundred school districts, colleges, county colleges and municipalities in twenty-one New Jersey counties.
The March 2, 2016 resolution approving the name change cited most of the foregoing factual findings, as well as findings that ESC-New Jersey intended to further expand the scope of its services, and its membership "to include representation that reflects the programmatic depth and geographic reach" of its newly-approved purpose; that those services would "supplement and not supplant services offered" by other ESCs; and that the name change would "more accurately reflect the clientele" it served.
The evidence presented supported those findings and the State Board reasonably based the name change on those relevant factors.
Affirmed.

We refer to the Middlesex Regional Educational Services Commission as ESC-New Jersey for the sake of clarity and convenience.

Council is comprised of ESCs from Morris, Camden, Somerset, Passaic, Essex, Monmouth-Ocean, Hunterdon, Sussex and Union counties, as well as Middlesex-now ESC-New Jersey. All ESCs present at a March 2, 2016 meeting unanimously approved Council's action opposing the name change; Somerset County ESC and ESC-New Jersey were not present.

Representative assembly means "a governing body of the [ESC] composed of an elected representative from each member district." N.J.S.A. 18A:6-51(k). Member district means "a public school district which by local board resolution joins the original petition to the State Board of Education for approval to establish an educational services commission, or subsequently becomes a member district by local board resolution and upon approval of the Board of Directors of the commission." N.J.S.A. 18A:6-51(g).

Board of Directors means "those members elected by the representative assembly to act on commission business on behalf of the assembly." N.J.S.A. 18A:6-51(i).

L. 1968, c. 243.

The State Board considered evidence that: ESC-New Jersey's revenues were $93.1 million; with two exceptions, other ESC revenues ranged from $18.9 million (Passaic) to $86.1 million (Essex), with transportation revenues comprising over sixty percent of those ESCs' revenues; Hunterdon ESC and Sussex ESC-with total revenues of $4.4 million and $4.8 million, respectively-had minimal transportation revenues but impacted a minimal number of students compared to the other eight ESCs.